UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | Case No. 21-CV-1919 |
| Plaintiff, | ECF Case |
| v. | **COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS** |
| JOHN DAVID MCAFEE and JIMMY GALE WATSON, JR., | |
| Defendants. | **JURY TRIAL DEMANDED** |

## I.     INTRODUCTION

1.     From at least in or around December 2017 through at least in or around February 2018 (the "Relevant Period"), John David McAfee ("McAfee") and Jimmy Gale Watson Jr. ("Watson") (collectively, "Defendants"), and others engaged in a digital asset "pump and dump" manipulative and deceptive scheme in which Defendants fraudulently recommended to the public to purchase digital assets such as verge, reddcoin, and dogecoin, among others, each a commodity in interstate commerce.  In furtherance of the manipulative and deceptive scheme, Defendants (a) identified digital assets with respect to which they believed McAfee's promotional efforts could move the market, (b) secretly accumulated positions in the digital assets in anticipation of deceptively promoting the digital assets online in order to cause price spikes; (c) falsely and misleadingly endorsed the digital assets via Twitter and other media as recommended long-term investments that would "change the world," thereby exploiting the broad reach of McAfee's public Twitter account, while concealing Defendants' true holdings and plan to liquidate the digital assets quickly; and (d) secretly sold off most or all of Defendants' holdings in these digital assets as prices rose sharply following McAfee's endorsements.  This

manipulative and deceptive scheme caused harm to market participants who paid inflated prices for the digital assets.

2.    During the Relevant Period, Defendants obtained gains from the manipulative and deceptive scheme involving short-term trading of digital assets such as bitcoin and other digital assets for a profit of in excess of $2 million at then-prevailing bitcoin valuations, to the detriment of individuals who purchased the digital assets at inflated prices, including individuals in the United States.

3.    Through this conduct, Defendants have engaged, are engaging, or are about to engage in fraudulent and manipulative acts and practices in violation of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26 (2018), and Commission Regulations ("Regulations"), 17 C.F.R. pts. 1–190 (2020), specifically Sections 6(c)(1), 6(c)(3), and 9(a)(2) of the Act, 7 U.S.C. §§ 9(1), (3), 13(a)(2) (2018), and Regulations 180.1(a) and 180.2, 17 C.F.R. §§ 180.1(a), 180.2 (2020).

4.    Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), the Commission brings this action to enjoin such acts and practices and compel compliance with the Act.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

5.    Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.    JURISDICTION AND VENUE

6.    **Jurisdiction**.  This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (district

courts have original jurisdiction over civil actions commenced by the United States or by any

agency expressly authorized to sue by Act of Congress). In addition, Section 6c(a) of the Act,

7 U.S.C. § 13a-1(a) (2018), authorizes the Commission to seek injunctive and other relief against

any person whenever it appears to the Commission that such person has engaged, is engaging, or

is about to engage in any act or practice constituting a violation of any provision of the Act or

any rule, regulation, or order thereunder.

7. **Venue**. Venue properly lies with the Court pursuant to Section 6c(e) of the Act,

7 U.S.C. § 13a-1(e) (2018), because Defendants are found in, inhabit, or transact business in this

District, or because acts and practices in violation of the Act occurred, are occurring, or are about

to occur, within this District.

### III.   THE PARTIES

8. Plaintiff **Commodity Futures Trading Commission** ("Commission" or

"CFTC") is an independent federal regulatory agency that is charged by Congress with the

administration and enforcement of the Act and the Regulations. The Commission maintains its

principal office at Three Lafayette Centre, 1155 21st Street, N.W. Washington, D.C. 20581.

9. Defendant **John David McAfee**, previously of Tennessee, is a natural person with

an unknown residence, currently detained by authorities in Spain awaiting extradition

proceedings. McAfee has never been registered with the Commission. During the Relevant

Period, McAfee tweeted from the verified Twitter account @officialmcafee.

10. **Jimmy Gale Watson Jr.** is a natural person whose last known residence is in

California. Watson was employed by McAfee during the Relevant Period and assisted in the

manipulative and deceptive scheme. Watson has never been registered with the Commission.

## IV.   FACTS

### A.   Overview

11.     A virtual currency is a type of digital asset defined here as a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value, but does not have legal tender status in any jurisdiction.  Bitcoin, ether, verge, dogecoin, reddcoin, and other virtual currencies are distinct from "real" currencies, which are the coin and paper money of the United States or another country that are designated as legal tender, circulate, and are customarily used and accepted as a medium of exchange in the country of issuance.

12.     Digital assets, such as bitcoin, ether, and other virtual currencies such as verge, dogecoin, and reddcoin, identified in this Complaint are encompassed by the definition of "commodity" under Section 1a(9) of the Commodity Exchange Act.

13.     During the Relevant Period, Defendants falsely and misleadingly endorsed several digital assets through social media distributed nation- and worldwide, for the purpose of deceiving investors, including those in New York, New York, into entering into contracts of sale of virtual currency, including bitcoin, verge, dogecoin, and reddcoin, among others, through electronic web-based virtual currency trading platforms based in various states and countries, thereby increasing short-term demand and higher prices for the digital assets that Defendants had secretly purchased shortly before.

### B.   McAfee's Purported Expertise, Research, and Unbiased Endorsement of Digital Assets

14.     During the Relevant Period, McAfee maintained a Twitter account with hundreds of thousands of "followers."  Among other things, McAfee used the account as a public platform to publicize his purported views of digital assets, including promotions of certain digital assets

and predictions as to their future value, to persons within this District, the United States, and the world.

15.     Defendants intended for McAfee's tweets and other promotional statements to have a significant short-term impact on the prevailing prices of digital assets that he promoted.

16.     Defendants intended to cause an artificial price for the digital assets that were the subject of the scheme.

17.     In December 2017, McAfee began tweeting recommendations for digital assets, and on or around December 20, 2017, McAfee publicly announced his plans to tweet a recommended digital asset each day, called the "Coin of the Day," and later the "Coin of the Week."

18.     McAfee endorsed or promoted at least ten digital assets as his promoted "Coin of the Day" or "Coin of the Week" during the Relevant Period.

19.     McAfee touted his recommendations as deeply researched, selected without bias from the vast majority of inferior digital assets, and long-term values to investors.  He stated that he had no position in the coins he recommended or endorsed.

20.     For example, on or around December 15, 2017, with respect to an endorsed digital asset, McAfee by public tweet on his @officialmcafee account denied owning any of the digital asset he had endorsed and further disclaimed having any ulterior motive.

21.     Similarly, on or around December 20, 2017, McAfee issued a tweet through his @officialmcafee account indicating that "[m]ost of the 2,000 coins are trash or scams. I've read every white paper. The few I'm connected to I will tell you. The rest I have no position in. These coins will change the world. You can support that change."

22.     In an interview on or around December 22, 2017, McAfee re-affirmed his purported lack of bias: "if I say this is a great coin, and nothing else, I promise you I don't own any of it, I am not affiliated with it, and I'm not interested in whether or not you buy it . . . . so I'm sorry this is what the world is . . . .  Listen, I'm 72 years old, what am I going to do with more money?  Seriously, I mean, my knees are bad.  What am I going to buy?  I don't need money.  What I need is to create a better world for [the] children."

23.     McAfee's recommendations tended to increase demand for the promoted digital asset.

24.     For example, on or around January 8, 2018, McAfee touted the digital asset dogecoin as his Coin of the Week.  Shortly after McAfee's endorsement of dogecoin, the digital asset's trading price rose more than 10% from the time just before McAfee's tweet.

25.     This pattern—McAfee's promotion of a digital asset, immediately followed by a short-lived price rise—occurred with respect to at least nine digital assets during the Relevant Period.

C.     **Defendants' Manipulative and Deceptive Scheme**

26.     During the Relevant Period, McAfee and Watson, with the assistance of others (including but not limited to "Agent 1"), engaged in a deceptive pump-and-dump scheme involving several digital assets.

27.     The manipulative and deceptive scheme involved trades on digital asset trading platforms in the United States, with persons located in the United States and beyond, including New York, New York.

28.     As is typical of such schemes, Defendants' scheme consisted of secretly accumulating a position in a digital asset, "pumping" in the form of touting the asset in order to increase demand, while deceptively concealing the full truth of the previously accumulated

6

position and the intent to promptly sell the position; and then "dumping" the asset by selling it into the inflated demand as price levels rise in response to the deceptive touting.

29.     McAfee and Watson strategically selected digital assets that would be suitable for the pump-and-dump scheme.

30.     *Verge Strategy.*  In or around December 13, 2017, as part of the scheme, McAfee transferred bitcoin worth approximately $20,000 using the then-prevailing valuation to Agent 1. McAfee then confirmed the transfer to Agent 1 via Skype messages and directed Agent 1 to use a portion of the bitcoin to trade for verge at the then-prevailing valuation in bitcoin.

31.     *Verge Build.*  As directed by McAfee, Agent 1 then traded approximately 0.4 bitcoin for over 687,000 verge.

32.     *Verge Pump.*  After Agent 1 had traded the bitcoin for McAfee via an electronic digital asset trading platform, McAfee issued tweets through his @officialmcafee account promoting and endorsing verge.  For example, on or around December 13, 2017, after Agent 1 had purchased verge using bitcoin, McAfee tweeted that he was "inundated by people asking me for recommendations on cryptocurrencies. If you would use your heads you would figure out that the privacy coins (anonymous transactions) will have the greatest future. Coins like Monero (XMR), Verge (XVG), or Zcash (ZEC) cannot lose."  The next day, McAfee followed up specifically regarding verge:

> No. Not joking. I included Verge (XVG) because it is a legitimate privacy coin and it is also selling for less than three cents. If you know investing, you know that it is easier for a 3 cent coin to go to 3 dollars, than it is for a $300 dollar coin to go to $30,000 - same rise.

These tweets were followed by a live interview of McAfee on or around December 16, 2017, in which he continued to tout verge.

33.     During and following McAfee's public touts of verge, the prevailing price of verge increased.  Initially, the price had tripled by the morning of on or around December 16, 2017, as Agent 1 reported to McAfee in a Skype message.  Ultimately, after the livestreamed interview with McAfee, the price of verge rose more than approximately 500% from the day before McAfee's first touts by tweet, to the end of day on or around December 17, 2017.

34.     *Verge Dump.*  As the price of verge rose, McAfee directed Agent 1 to trade McAfee's verge position for bitcoin, yielding approximately 2 bitcoin, approximately five times the original investment.

35.     *Verge Concealment.*  During McAfee's trading for verge by and through Agent 1, as well as during McAfee's widely distributed public promotions of verge, McAfee did not disclose his financial interest in verge, nor his intent to sell his verge position as the verge price rose after his promotion.

36.     After Defendants' pump and then dump of verge, Defendants announced that they would engage in the "Coin of the Day" recommendation program, but did not disclose that they would use the purported Coin of the Day series to engage in pump-and-dumps of several digital assets over a short period of time.

37.     Effectively, rather than a true endorsement of a digital asset that McAfee expected to "change the world" and be a valuable long-term investment, the Coin of the Day series was merely a series of pump-and-dumps.  Defendants collaborated together to select the digital asset identified for each digital asset to recommend.

38.     *Reddcoin Strategy.*  For example, early in the morning on or around December 24, 2017, McAfee directed Agent 1 to accumulate a position in the digital asset reddcoin by trading bitcoin, explaining that McAfee intended to issue a promotional tweet at 9:00 AM the

next morning, and directing Agent 1 to sell McAfee's reddcoin position when the prevailing

reddcoin price, as a result of McAfee's tout tweet, reached a 60% increase.

39.     ***Reddcoin Build.***  Agent 1, consistent with McAfee's instructions, promptly traded

approximately 33 bitcoin in exchange for approximately 43,000,000 reddcoin.

40.     For his own benefit as part of the scheme, around this time, Watson also traded a

smaller amount of bitcoin for a position in reddcoin in anticipation of the pump.

41.     ***Reddcoin Pump.***  Hours later, consistent with the stated plan, McAfee issued a

tout tweet through his @officialmcafee account promoting reddcoin as the "coin of the day" and

describing it as undervalued.

42.     Specifically, McAfee tweeted that reddcoin was a "sleeper," the "most widely

used social network coin," and had been "flying under the radar since 2014."

43.     Shortly following McAfee's tout by tweet, the prevailing market price of reddcoin

surged by approximately 100% over the previous day's closing price.

44.     ***Reddcoin Dump.***  Almost immediately following McAfee's tout by tweet, as

directed by McAfee, and as reddcoin's prevailing price rose sharply, Agent 1 sold the previously

accumulated reddcoin position for bitcoin.

45.     These trades generated bitcoin profits in the account controlled by Agent 1 of

approximately 26 bitcoin.  Watson similarly sold his entire position shortly after the tweet, and

netted a profit of approximately 0.8 btc.

46.     McAfee closely followed Agent 1's efforts.  During the dump of reddcoin that

McAfee had directed, McAfee wrote to Agent 1, "let me know when you have finished selling,"

and when Agent 1 confirmed the reddcoin had been sold for bitcoin, McAfee replied, "high

five."

47. *Reddcoin Concealment.*  McAfee did not disclose his recently acquired position in reddcoin in advance of the tout, nor did he reveal to his Twitter followers that his intent was to create a short-term spike in the price of reddcoin.

48. *Dogecoin Strategy.*  On or around January 3, 2018, McAfee and Watson strategized as to the next digital asset to be the vehicle of their pump-and-dump scheme.  Watson recommended dogecoin.  Watson also recommended to McAfee waiting for dogecoin to increase in price after their building of a position before tweeting out the promotion.  Watson predicted to McAfee that the market price of dogecoin would likely "skyrocket" almost immediately after McAfee's tweet, just as other digital assets touted by McAfee had done.

49. *Dogecoin Build.*  McAfee then directed Agent 1 to trade bitcoin for dogecoin.  Over the next few days, Agent 1 traded approximately 74.5 bitcoin in exchange for approximately 119.3 million dogecoin.  In addition, Watson himself built a position in dogecoin, spending approximately 4.1 btc to purchase approximately 6.7 million dogecoin.

50. *Dogecoin Pump.*  On or around January 8, 2018, or about five days after Watson and McAfee had identified dogecoin as the next coin to promote, McAfee issued a tout by tweet endorsing dogecoin as his "Coin of the Week."  The tout did not disclose Defendants' financial interest in dogecoin, their intent to dump dogecoin as the price spiked after being touted, or the fact that McAfee was not endorsing dogecoin without bias as a long-term value for investors.

51. *Dogecoin Dump.*  Almost immediately after McAfee's tout by tweet of dogecoin, at McAfee's direction, his team traded his dogecoin position for a net profit of approximately 49.5 bitcoin.  Additionally, at the same time as Agent 1 was selling dogecoin, Watson also sold his dogecoin position for a net profit of more than 2.9 btc.

52.     During the Relevant Period, McAfee and Watson, directly and through others, engaged in similar iterations of the pump-and-dump scheme with respect to other digital assets as well.

D.     **Deceptive Nature of Defendants' Scheme**

53.     At various times during the Relevant Period, McAfee made misleading statements and omissions concerning his financial interest and intent as to the touted digital assets.

54.     For example, in or around December 15, 2017, in response to a Twitter user questioning whether McAfee had endorsed the digital asset verge so as to "pump the coin" for his own financial benefit, McAfee misleadingly stated through his @officialmcafee account that he did not have a position in the digital asset and falsely disclaimed any ulterior motive for his recommendations and endorsements.

55.     In fact, McAfee by and through his team had built a position in the digital asset verge shortly before the tout by tweet in order to pump and then dump the digital asset into the resulting price spike.

56.     At various times during the Relevant Period, McAfee misleadingly characterized his endorsements of digital assets as recommendations for long-term investments.

57.     For example, on or around January 28, 2018, with respect to a Coin of the Week recommendation, McAfee stated by tweet that "all" of his recommendations were "long term recommendations."

58.     McAfee further claimed that his recommendations were based on significant research, including review of thousands of "white papers" on the digital assets.

59.     In fact, by on or around December 20, 2017, McAfee had not "read every white paper."

60.     In fact, rather than thoroughly researched, truthful recommendations for long-term value, McAfee's endorsements of the digital assets were part and parcel of Defendants' short-term pump-and-dump scheme.

61.     In fact, McAfee's and Watson's criteria for selecting digital assets for McAfee's endorsement centered on suitability for the pump-and-dump scheme, not long term value and not potential to "change the world."  McAfee's criteria for identifying digital assets included current market price, circulating supply, market capitalization, and trading volume.

62.     Defendants understood that touting a digital asset for purchase on certain grounds, while simultaneously trying to sell their previously accumulated position in the digital asset, was deceptive and wrongful.

63.     For example, in the interview on or around December 22, 2017, McAfee warned investors to view digital asset recommendations with suspicion because: "[Unscrupulous promoters] go, 'Oh, I love this one, or I love that one, and this looks great.' They don't know why they're saying it. Maybe they're saying it because they bought 100,000 coins and they can't sell them, right?"

64.     McAfee made these and other false and misleading representations and omissions of material facts to prospective investors in the touted digital assets during the Relevant Period, including but not limited to through social media available across the United States and worldwide.

65.     McAfee made these and other false and misleading representations and omissions of material facts to prospective investors as well as persons already holding positions in the digital assets knowingly or with reckless disregard for the truth.

66.     Defendants knew or were reckless in not knowing that these statements were false

and misleading.

67.     Defendants understood that these false and misleading statements were in

furtherance of the scheme.

## V.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### Count I—Fraud and Manipulation by Deceptive Device or Contrivance
### Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2020)

68.     Paragraphs 1 through 67 are re-alleged and incorporated herein by reference.

69.     7 U.S.C. § 9(1), makes it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any
> swap, or a contract of sale of any commodity in interstate commerce,
> or for future delivery on or subject to the rules of any registered
> entity, any manipulative or deceptive device or contrivance, in
> contravention of such rules and regulations as the Commission shall
> promulgate by not later than 1 year after [July 21, 2010, the date of
> enactment of the Dodd-Frank Wall Street Reform and Consumer
> Protection Act] . . . .

70.     17 C.F.R. § 180.1(a), provides:

> It shall be unlawful for any person, directly or indirectly, in
> connection with any swap, or contract of sale of any commodity in
> interstate commerce, or contract for future delivery on or subject to
> the rules of any registered entity, to intentionally or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative
> device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of
> a material fact or to omit to state a material fact necessary in order
> to make the statements made not untrue or misleading;
>
> (3) Engage, or attempt to engage, in any act, practice, or course of
> business, which operates or would operate as a fraud or deceit upon
> any person . . . .

71.     During the Relevant Period, as described above, Defendants violated

7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) by, among other things, in connection with contracts of

sale of commodities in interstate commerce, making or attempting to make untrue or misleading

statements of material fact or omitting to state or attempting to omit material facts necessary in

order to make statements made not untrue or misleading, such as the following:

> A.  Misleadingly characterizing Defendants' digital asset recommendations as based
>     on substantial research into long-term value, rather than simply digital assets
>     susceptible to the pump-and-dump scheme;
>
> B.  Misleadingly issuing purportedly unbiased digital asset touts by tweet while
>     disclaiming financial interest in a short-term price rise; and
>
> C.  Misrepresenting or concealing the true motive of Defendants' digital asset touts
>     by tweet, namely, to contribute to a short-term price rise and secretly trade out of
>     the position into that price rise.

72.     Defendants engaged in the acts and practices described above willfully,

intentionally, or recklessly.

73.     By this conduct, Defendants violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

74.     Section 13(a) of the Act provides that "[a]ny person who commits, or who willfully

aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the

provisions of this [Act or Regulations] or who acts in combination or concert with any other person

in any such violation, or who willfully causes an act to be done or omitted which if directly

performed or omitted by him or another would be a violation of the provisions of this chapter or any

of such rules, regulations, or orders may be held responsible for such violation as a principal."  7

U.S.C. § 13c(a).

75.     Pursuant to Section 13(a) of the Act, each Defendant is liable for the other's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

76.     Each act of:  (1) using or employing, or attempting to use or employ, a manipulative device, scheme, or artifice to defraud; (2) making, or attempting to make, untrue or misleading statements of material fact, or omitting to state material facts necessary to make the statements not untrue or misleading; and (3) engaging, or attempting to engage, in any act, practice, or course of business, which operated or would operate as a fraud or deceit upon any person, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

### Count II—Attempted Manipulation of the Price of a Commodity
**Sections 6(c)(3) and  9(a)(2) of the Act, 7 U.S.C. §§ 9(3), 13(a)(2) (2018), and Regulation 180.2, 17 C.F.R. § 180.2 (2020)**

77.     Paragraphs 1 through 67 are re-alleged and incorporated herein by reference.

78.     Section 6(c)(3) of the Act, 7 U.S.C. § 6(c)(3) (2018) makes it unlawful for "any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."

79.     Section 9(a)(2) of the Act, 7 U.S.C. § 9(a)(2) (2018), makes it unlawful for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or any swap . . . ."

80.     Commission Regulation 180.2, 17 C.F.R. § 180.2 (2020), makes it "unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."

81.     During the Relevant Period, as described above, Defendants attempted to manipulate the price of a commodity in interstate commerce or for future delivery on or subject to the rules of any registered entity in violation of Sections 6(c)(3) and 9(a)(2) of the Act and Regulation 180.2.

82.     Section 13(a) of the Act provides that "[a]ny person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this [Act or Regulations] or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal."  7 U.S.C. § 13c(a).

83.     Pursuant to Section 13(a) of the Act, each Defendant is liable for the other's violations of 7 U.S.C. § 9(3) and 17 C.F.R. § 180.2.

84.     Each and every overt action in furtherance of the attempt to manipulate prices, and each act of attempted manipulation is alleged herein as a separate and distinct violation of Sections 6(c)(3) and 9(a)(2) of the Act and Regulation 180.2.

## VI.     <u>RELIEF REQUESTED</u>

**WHEREFORE**, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), and pursuant to its own equitable powers, enter:

A.  An order finding that Defendants violated Sections 6(c)(1), 6(c)(3), and 9(a)(2) of the Act, 7 U.S.C. §§ 9(1), (3), 13(a)(2) (2018), and Regulations 180.1(a) and 180.2, 17 C.F.R. §§ 180.1(a), 180.2 (2020);

B.  An order of permanent injunction enjoining each Defendant and any other person or entity associated with them, including but not limited to affiliates, agents,

servants, employees, assigns, attorneys, and all persons in active concert or

participation with each Defendant, including any successor thereof, from:

   i.   Engaging, directly or indirectly, in conduct in violation of

        7 U.S.C. §§ 9(1), (3), 13(a)(2), and 17 C.F.R. §§ 180.1(a), 180.2;

  ii.   Trading on or subject to the rules of any registered entity (as that term is

        defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2018));

 iii.   Entering into any transactions involving "commodity interests" (as that

        term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2020)), for their own

        personal account(s) or for any account in which a Defendant has a direct

        or indirect interest;

  iv.   Having any commodity interests traded on either Defendant's behalf;

   v.   Controlling or directing the trading for or on behalf of any other person or

        entity, whether by power of attorney or otherwise, in any account

        involving commodity interests;

  vi.   Soliciting, receiving, or accepting any funds from any person for the

        purpose of purchasing or selling any commodity interests;

 vii.   Applying for registration or claiming exemption from registration with the

        Commission in any capacity, and engaging in any activity requiring such

        registration or exemption from registration with the Commission, except

        as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2020);

        and/or

viii.   Acting as a principal (as that term is defined in Regulation 3.1(a),

        17 C.F.R. § 3.1(a) (2020)), agent, or any other officer or employee of any

person (as that term is defined in 7 U.S.C. § 1a(38), registered, exempted

from registration, or required to be registered with the Commission except

as provided for in 17 C.F.R. § 4.14(a)(9));

C.  An order requiring Defendants to pay civil monetary penalties of not more than

the civil monetary penalty prescribed by Section 6c(d)(1) of the Act, 7

U.S.C. § 13a-1(d)(1) (2018), as adjusted for inflation pursuant to the Federal Civil

Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74,

129 Stat. 584, title VII, Section 701, *see* Commission Regulation 143.8,

17 C.F.R. § 143.8 (2020), for each violation of the Act or Regulations, plus post-

judgment interest;

D.  An order directing Defendants, as well as any successors thereof, to disgorge,

pursuant to such procedure as the Court may order, all benefits received

including, but not limited to, trading profits, revenues, salaries, commissions,

fees, or loans derived directly or indirectly from acts or practices which constitute

violations of the Act and Regulations, as described herein, and pre- and post-

judgment interest thereon from the date of such violations;

E.  An order directing Defendants, as well as any successors thereof, to make full

restitution, pursuant to such procedure as the Court may order, to every customer

and investor whose funds Defendants received, or caused another person or entity

to receive, as a result of the acts and practices constituting violations of the Act

and Regulations, as described herein, and pre- and post-judgment interest thereon

from the date of such violations;

18

F.  An order directing Defendants, as well as any successors thereof, to rescind, pursuant to such procedure as the Court may order, all contracts and agreements, whether express or implied, entered into between, with, or among Defendants and any customer or investor whose funds were received by either Defendant as a result of the acts and practices which constituted violations of the Act and the Regulations, as described herein;

G.  An order directing that Defendants, and any successors thereof, make an accounting to the Court of all of their assets and liabilities, together with all funds they received from and paid to investors and other persons in connection with commodity transactions and all disbursements for any purpose whatsoever of funds received from commodity transactions, including salaries, commissions, interest, fees, loans, and other disbursement of money or property of any kind from at least the beginning of the Relevant Period to the date of such accounting;

H.  An order requiring Defendants and any successors thereof to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2018); and

I.  An order providing such other and further relief as the Court deems proper.

*     *     *

## VII.   <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial.

Dated:  March 5, 2021

                            **COMMODITY FUTURES TRADING**
                            **COMMISSION**

                            By: *s/Gates S. Hurand*
                            Alejandra de Urioste
                            Gates S. Hurand
                            David Oakland
                            Senior Trial Attorneys
                            adeurioste@cftc.gov
                            ghurand@cftc.gov
                            doakland@cftc.gov
                            Phone: (646) 746-9700

                            K. Brent Tomer
                            Chief Trial Attorney
                            ktomer@cftc.gov
                            Phone: (646) 746-9700

                            Manal M. Sultan
                            Deputy Director
                            msultan@cftc.gov
                            Phone: (646) 746-9700

                            Commodity Futures Trading Commission
                            Division of Enforcement
                            140 Broadway, 19th Floor
                            New York, NY 10005
                            Phone: (646) 746-9700
                            Fax: (646) 746-9940

                            ATTORNEYS FOR PLAINTIFF
                            COMMODITY FUTURES TRADING
                            COMMISSION